RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0101p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

CRANPARK, INC.,

       *Plaintiff-Appellant/Cross-Appellee,*

    *v.*

    Nos. 14-3753/3832

ROGERS GROUP, INC.,

       *Defendant-Appellee/Cross-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:04-cv-01817—George J. Limbert, Magistrate Judge.

Argued: December 10, 2015

Decided and Filed: April 22, 2016

Before: GRIFFIN and KETHLEDGE, Circuit Judges; and CLELAND, District Judge.[*]

—————————————

## COUNSEL

**ARGUED:** David E. Mills, THE MILLS LAW OFFICE LLC, Cleveland, Ohio, for Appellant/Cross-Appellee. David A. Kutik, JONES DAY, Cleveland, Ohio, for Appellee/Cross-Appellant. **ON BRIEF:** David E. Mills, THE MILLS LAW OFFICE LLC, Cleveland, Ohio, Jonathon M. Yarger, YARGER RADEL & PENTZ, LLC, Cleveland, Ohio, Michael B. Pasternak, Beachwood, Ohio, for Appellant/Cross-Appellee. David A. Kutik, JONES DAY, Cleveland, Ohio, Chad A. Readler, JONES DAY, Columbus, Ohio, for Appellee/Cross-Appellant.

---

[*]The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

_____

**OPINION**

_____

CLELAND, District Judge.  This case is grounded in a story all too familiar to jurists (and to business interests, we suspect): a promising joint venture gone wrong.  Following the breakdown of the parties' business relationship, Cranpark, Inc. ("Cranpark') sued and won a $15.6 million jury verdict based on a promissory-estoppel claim against Rogers Group, Inc. ("RGI").  That jury verdict, however, was set aside when the district court granted RGI's renewed motion for judgment as a matter of law on the ground that Cranpark did not prove standing at trial.  Cranpark now seeks review of that decision.  RGI files a cross-appeal as well on a number of issues.  We reverse the district court's decision, reinstate the jury's verdict, and remand the case to the district court for calculation of interest on the verdict.

I.

Cranpark is the successor-in-interest to Hardrives Paving and Construction, Inc. ("Hardrives").  Hardrives was an asphalt paving company based near Youngstown, Ohio that was owned and operated by James Sabatine.  Asphalt production requires crushed stone.  In the 1990s, the main crushed-stone supplier in the Youngstown area decided to discontinue its stone product.  Seeing an opportunity, RGI, a supplier with a quarry in Sandusky, Ohio, approached Hardrives.  RGI was interested in growing its business into the Youngstown area and wanted to partner with a large purchaser like Hardrives.  The two parties began discussing the possibility of jointly establishing a large facility in Youngstown that would serve as a distribution center for RGI and a new asphalt production plant for Hardrives.

The parties began to develop plans for a joint venture.  On September 1, 1998, Tom Stump (RGI's lead on the Youngstown project), Greg Gould (Stump's boss and second in command at RGI), and Sabatine met to outline their plan for the distribution and production facility.  A document produced at the meeting established the basic terms of their agreement and included certain contingencies that would need to be met for the venture to be profitable, such as the minimum amount of stone Hardrives was to buy from RGI, low-cost railroad transportation

rates, and the need for certain incentives from the city. The document also stated that it was subject to RGI senior management approval. Both parties signed the document once all the key terms were in place.

A critical component of RGI and Hardrives' plan was affordable railroad access to and from the distribution center. Rail transportation was the least expensive way to transport stone from the Sandusky quarry to the distribution center, and without low transportation costs the venture could not succeed. However, Sabatine was not having any luck convincing Norfolk Southern, the railroad company, to establish rail access. So, in 1998, while RGI and Hardrives were developing plans for their joint venture, Sabatine enlisted Congressman James Traficant to help him convince Norfolk Southern to establish rail access at the contemplated Youngstown distribution center. The plan worked, and Sabatine, Traficant, and representatives from Norfolk Southern met and began discussions that, after subsequent meetings, resulted in RGI and Hardrives arriving at an acceptable rail rate with Norfolk Southern.

Throughout 1998 Hardrives and RGI moved forward with their joint plans, and that year they selected a site for the facility on Center Street in Youngstown. Based on the belief that its deal with RGI was progressing according to plan, Hardrives began bidding on larger paving projects and purchasing equipment for its soon-to-be expanded business. By December, all the contingencies that RGI and Hardrives agreed upon in September were fulfilled, except RGI had arguably not given explicit senior management approval. Also by December, Sabatine was ready to place an order for a large asphalt plant that would be installed at the Center Street location. Because the plant was a large investment—more than $1.5 million—Sabatine called Tom Stump before making the final purchase. During that phone conversation, according to Sabatine, Stump was enthusiastic about Sabatine's plans to purchase the plant and gave him the go ahead. Sabatine then purchased the plant.

However, a few months later in February of 1999, RGI told Hardrives that it would no longer be participating in the joint venture. Soon after the deal failed, Hardrives began losing money, and by 2001 Sabatine decided to sell the business and signed an asset purchase agreement with McCourt Construction Company ("McCourt"). As part of the asset sale, Hardrives agreed not to use its name, and so the company became Cranpark, Inc.

Also relevant, during the time the deal between RGI and Hardrives was breaking down, Sabatine was the subject of an FBI investigation into public corruption concerning, among others, Congressman Traficant.  Unbeknownst to RGI, after his initial meeting with Norfolk Southern, Sabatine paid Congressman Traficant a $2,400 bribe.  In 2001, a few years after the Youngstown deal collapsed, Sabatine pleaded guilty to bribery and was sentenced to spend time in a halfway house, followed by house arrest during two years' probation, and pay fines and restitution.

On September 8, 2004, Cranpark filed suit against RGI alleging breach of contract and promissory estoppel.  The parties consented to have all proceedings in the district court conducted by a magistrate judge. 28 U.S.C. § 636(c).

In 2010, the district court granted summary judgment in favor of Defendant RGI, holding that the breach of contract claim was governed by a four-year statute of limitations in the Ohio Commercial Code and that Cranpark had filed suit after this statutory deadline.  The court also held that the promissory estoppel claim should be dismissed because RGI's representations were not unambiguous promises on which Sabatine and Hardrives could have reasonably relied. We reversed the grant of summary judgment on both grounds and remanded the case.  *Cranpark, Inc. v. Rogers Grp., Inc.*, 498 F. App'x 563 (6th Cir. 2012).

In November 2013, the parties presented the case to a jury.  When James Sabatine testified about selling the Hardrives business to McCourt he said that he sold everything and agreed that he sold "the site, the plant, the accounts, the contracts, the books, the record, the documents, everything[.]"  At the close of evidence, RGI orally moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). RGI argued that Cranpark was not the "proper party to [the] case" because it had sold everything, including the right to bring the cause of action, to McCourt.  The district court denied the motion, orally ruling, "I think there's enough in there that it's Cranpark's claim."

The case was then submitted to the jury, which returned a verdict in favor of Cranpark on the promissory-estoppel claim, awarding $15.6 million in damages.  On December 2, 2013, the court entered judgment for Cranpark.

Among other post-trial motions, RGI filed a Rule 50(b) renewed motion for judgment as a matter of law. In its renewed motion, RGI argued that during the asset sale Cranpark had transferred its right to sue to McCourt, thus depriving Cranpark of Article III standing. The court agreed, holding that even when a party originally suffers an injury, "if that party subsequently sells its claim for that injury, the party no longer has an injury that can be redressed by a favorable decision and will not satisfy the redressability element of standing." *Cranpark, Inc. v. Rogers Grp., Inc.*, No 4:04-cv-1817, 2014 WL 3749401, at *4 (N.D. Ohio July 30, 2014) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Accordingly, the court granted RGI's motion. *Id.* at *10.

As an alternative ground, RGI also argued in its Rule 50(b) motion that Sabatine's bribe to Traficant should have precluded his claims for breach of contract and promissory estoppel. The district court rejected this argument because it was not raised in RGI's Rule 50(a) motion, as required by the Rule. *Id.* at *9.

RGI also filed a Rule 59 motion for a new trial, but the court deferred ruling on that motion, stating, "[i]f the instant case is remanded, the Court will then address that Motion." *Id.* at *10.

## II.

We review *de novo* a grant of judgment as a matter of law under Federal Rule of Civil Procedure 50. *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 406 (6th Cir. 2014).

## A.

The first question is whether a plaintiff loses Article III standing when he transfers his interest in a cause of action to another. It is well established that to satisfy Article III's standing requirement, the plaintiff must have suffered an injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff must also show that the injury is fairly traceable to the defendant's conduct. *Id.* And lastly, a favorable decision by the court must be likely to redress the injury. *Id.* at 561.

RGI argues, as the district court held, that when a party sells its interest in a cause of action, that party loses Article III standing because the court can no longer redress the seller's injury. Additionally, RGI goes beyond the district court's holding and argues that such a sale erases any injury in fact, as well.

Cranpark asserts in turn that when a party transfers its interest in a cause of action it is not Article III standing that is implicated, but instead Federal Rule of Civil Procedure 17's real-party-in-interest requirement. That rule simply mandates that "[a]n action must be prosecuted in the name of the real party in interest." We have clarified the rule, stating, "the real party in interest is the person who is entitled to enforce the right asserted under the governing substantive law. The real party in interest analysis turns on whether the substantive law creating the right being sued upon affords the party bringing suit a substantive right to relief." *Certain Interested Underwriters at Lloyd's, London, Eng. v. Layne*, 26 F.3d 39, 42-43 (6th Cir. 1994) (citations omitted). The distinction is critical here because the real-party-in-interest requirement is generally viewed as "an affirmative defense that can be waived," *RK Co. v. See*, 622 F.3d 846, 850 (7th Cir. 2010), while Article III standing is plaintiff's burden to prove and can be raised at any point. When raised late in litigation, as in this case, challenges under Rule 17(a) are generally considered waived or forfeited. *See e.g.*, *Whelan v. Abell*, 953 F.2d 663, 671-72 (D.C. Cir. 1992) (Rule 17(a) defense waived when raised on first day of trial); *Gogolin & Stelter v. Karn's Auto Imports, Inc.*, 886 F.2d 100, 102-03 (5th Cir. 1989) (defense waived when made at the close of plaintiff's evidence).

We conclude that one who sells his interest in a cause of action is not deprived of Article III standing, but he is susceptible to a real-party-in-interest challenge, at least if the challenge is timely raised.

Considering RGI's standing arguments, we do not think it can seriously be contended that Cranpark has suffered *no* injury in fact. RGI argues that though Cranpark suffered an injury, it then forfeited that injury by transferring its property right in the claim. While one Second Circuit case has noted that "the minimum requirement for an injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim," that case was concerned with whether standing could be established for the *transferee*, not whether the transfer somehow erased the

transferor's injury. *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008) (citing *Sprint Commc'ns Co., L.P. v. APPC Servs., Inc.*, 544 U.S. 269 (2008)). In *W.R. Huff*, the Second Circuit held that a power-of-attorney does not confer standing to sue because a power-of-attorney does not transfer an ownership interest in the claim. 549 F.3d at 108-09. That says nothing, of course, about the status of the transferor's Article III injury.

Cranpark has suffered a paradigmatic economic injury traceable to RGI's decision to back out of the joint venture. RGI does not appear to dispute that its actions with regard to the joint venture caused the collapse of Sabatine's business. Expecting access to a cheap supply of crushed stone and expanded asphalt production capabilities, Sabatine moved his healthy business to the new site at Center Street in Youngstown and began taking on larger contracts. When RGI cut off access to the supply of the affordable crushed stone that was essential to Hardrives' success, Sabatine's business model collapsed. No more is needed to establish this classic economic injury-in-fact.

Alternatively, RGI argues, as the district court held, that Cranpark fails to meet the redressability requirement because after the asset sale relief should run to McCourt and not Cranpark. This contention, however, confuses the proper focus of the redressability inquiry of the standing analysis, which requires the court to consider "the causal connection between the alleged injury and the judicial relief requested." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). "Redressability does not require that the plaintiff actually be entitled to the relief sought; it is enough that the requested relief, if granted, would redress the plaintiff's injury." 15 James Wm. Moore et al., *Moore's Federal Practice* § 101.42 (3d ed. 2015) (citing *Lac Du Flambeau Band of Lake Superior v. Norton*, 422 F.3d 490, 501-502 (7th Cir. 2005); *Salmon Spawning v. United States Customs and Border Prot.*, 550 F.3d 1121, 1130-31 (Fed. Cir. 2008)). Whether Cranpark or McCourt is entitled to relief is a question for Ohio law. As to the Article III redressability concern, considering the connection between the injury and the relief requested, we have little doubt that money damages are capable of redressing the economic injury of which Cranpark complains.

We think that Cranpark has the better view, that is, that the asset sale and transfer of Cranpark's claims to McCourt implicates Federal Rule of Civil Procedure 17, not Article III. In

this case, the question is whether and to whom Ohio law provides a legal right of enforcement. This and other circuits have noted that such an inquiry is governed by Rule 17's real-party-in-interest requirement. *See White v. JPMorgan Chase Bank, NA*, 521 F. App'x 425, 428 (6th Cir. 2013) ("We find that Plaintiff is not the real party in interest because he does not have a legal right of enforcement under Michigan law."); *Am. Triticale, Inc. v. Nytco Servs., Inc.*, 664 F.2d 1136, 1141 (9th Cir. 1981) ("Whether American is a real party in interest under Fed. R. Civ. P. 17(a) in this federal diversity action is dependent upon whether American is a proper party to maintain this action under applicable state law.").

It is not surprising that there is a degree of confusion in drawing a line between Article III standing and the real-party-in-interest requirement. Lawyers, and courts, often fail to distinguish between these two distinct issues. For example, RGI quotes *Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc.*, 198 F.3d 415, 420 (3d Cir. 1999), in which the opinion notes that "[u]nder Pennsylvania law, . . . a contracting party that has assigned its contract rights to a third party does not have standing to enforce that contract." That case held, RGI argues, that an assignor lacks "standing" to enforce contractual rights it has assigned. *Id.* at 425. However, importantly, in the penultimate sentence of the opinion, the Third Circuit actually held that the plaintiff did "not have standing *as the real party in interest* under Fed. R. Civ. P. 17." *Id.* (emphasis added). A plaintiff may have standing in the Article III sense but not be the real party in interest.

The D.C. Circuit addressed the distinction in *Whelan v. Abell*, 953 F.2d 663, 671-72 (D.C. Cir. 1992). There the question concerned a stockholder's right to sue a party that had caused some harm to a corporation, thereby injuring the stockholder by causing loses on his investment.

> To be sure, courts have on occasion denied stockholders' suits alleging injury, asserting that the stockholders lacked "standing" to bring such an action because the stockholders, experiencing no direct harm, possess no *primary* right to sue. But we do not read these cases as actually turning on the question whether the stockholder has suffered a sufficiently direct injury to establish Article III injury or causation. . . . Conceptually, then, the problem is not an Article III one.
>
> Standing and real-party-in-interest questions do overlap to the extent that both ask whether the plaintiff has a personal interest in the controversy. But the question whether the suit should be brought by the [plaintiffs] or the Corporation

really depends, as we have noted, on considerations and conventions of corporate law . . . which we think are brought into play under Rule 17(a) of the Federal Rules of Civil Procedure.

*Id.* (emphasis in original) (internal quotations and citations omitted).

The Sixth Circuit, too, has noted the distinction between the Article III and Rule 17 analyses. *White*, 521 F. App'x at 428; *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 532-33 (6th Cir. 2002) (addressing the distinction and collecting cases). In *White*, the plaintiff, president and sole shareholder of a corporation, accepted a cashier's check with his name listed as the payee. He admitted, however, that he received the check in his official capacity as president and deposited the check into the corporation's bank account. When an issue arose concerning the bank's willingness to honor the check, White sued the bank in his own name. The district court granted summary judgment under Rule 17, holding that the action should have been brought in the corporation's name. We affirmed, *id.* at 430, noting that,

> the inquiry before this Court is not one of Article III standing. *See Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531-32 (6th Cir. 2002) (detailing the distinction between Article III standing and Rule 17(a)). Rather, the question is whether Michigan's substantive law precludes Plaintiff from bringing this diversity action despite possibly having constitutional standing. *See Certain Interested Underwriters at Lloyd's, London, England v. Layne*, 26 F.3d 39, 43 (6th Cir. 1994).

*Id.* at 428. Just as White forfeited his proprietary interest in the check by assigning it to the company, RGI argues Cranpark has done the same with its legal claims. This, however, implicates Rule 17 not Article III.

We hold, therefore, that Cranpark has constitutional standing to pursue this litigation.

B.

As another, independent ground for reversal, Cranpark seeks review of the district court's decision to not consider the asset purchase agreement ("the APA") when it decided that Cranpark sold its interest in any legal claims against RGI. Cranpark contends now, as it did in the district court, that it did not sell those claims and that the APA unambiguously reserves to Cranpark the right to bring such claims. The district court refused to consider the APA, relying on language in

the Supreme Court's decision in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), i.e., that facts supporting standing must be "supported adequately by the evidence adduced at trial." Because the APA was not "adduced at trial," the district court believed the document should not be considered in deciding the Rule 50(b) motion.

We disagree with that conclusion. It is true that *Lujan* outlines the increasing burden plaintiffs face in proving standing at the successive stages of litigation. *Id.* During the pleading stage, plaintiffs need only make general factual allegations of injury, but "at the final stage, those facts (*if controverted*) must be supported adequately by the evidence adduced at trial." *Id.* (emphasis added). As is clear from the face of this language, however, a plaintiff need not waste time at trial presenting proof of injury if the standing question reasonably appears to be settled.

Cranpark asserts that its standing was indeed settled and that RGI never challenged it at any stage before the close of proofs. This appears to be correct. The record suggests that standing was a foregone conclusion before and during trial. RGI claims it raised the issue in its Rule 50(a) motion, but it was not styled as an Article III standing challenge until raised in its Rule 50(b) motion. Leading up to trial, in fact, the court noted in resolving the summary judgment motion that "Plaintiff has standing to pursue its claim against Defendant." *Cranpark, Inc. v. Rogers Grp., Inc.*, 721 F. Supp. 2d 613, 616 (N.D. Ohio 2010). Additionally, Cranpark points out that RGI nowhere indicated in its pretrial statement that it planned to make an issue of the claim assignment or Cranpark's Article III standing. Thus, Cranpark argues, the parties never introduced the APA at trial because it had so little relevance to any issue actually in contention.

RGI, in turn, contends that it did alert Cranpark to the standing deficiency in its Rule 50(a) motion. In its oral Rule 50(a) motion to the court, RGI argued,

> There is no evidence on which a jury could reasonably find that Cranpark is the proper party to this case. The evidence is that Hardrives, if there was a contract, was the party to the contract, and there is no sufficient evidence on which a jury can conclude that Cranpark is the proper party. There is no evidence that when he sold his business of Hardrives, that he retained the right to pursue this contract. As a matter of fact, his testimony is that he sold everything to McCourt, including contracts. That's what he said. So unless there is some evidence on which to believe that he retained the right to bring this cause of action by changing the

name of Hardrives, the shell corporation that remained, in bringing this lawsuit, we have a failure of proof and no reasonable jury could conclude that Cranpark is in possession of this contract right, because his testimony was that he sold to McCourt, including contracts.

At no point did counsel utter the words "standing" or "Article III"—words and phrases one might expect to employ when challenging an opposing party's Article III standing. Instead counsel spoke only of whether Cranpark was a "proper party"—which sounds in Rule 17.

When it was Cranpark's turn to oppose the motion, the court asked Cranpark's counsel, "[w]hat about the asset deal?" Cranpark's counsel argued that the testimony established only that McCourt had purchased the construction contracts, not that Cranpark had sold *all* the rights of the company. The court immediately denied the Rule 50(a) motion, holding that "I think there's enough in there that it's Cranpark's claim." That ambiguous and immediately-denied oral motion at the close of all proofs was the first time Cranpark's standing was arguably controverted.

To be sure, when standing is truly controverted at trial, a judge will often be justified in refusing to hear new evidence on standing during post-trial briefing. However, the cases RGI cites to show that courts do limit their post-trial standing analysis to trial evidence are all cases in which standing was clearly at issue both before and during trial. *See, e.g., ASPCA v. Feld Entm't Inc.*, 659 F.3d 13, 18 (D.C. Cir. 2011) (standing heavily litigated at motion to dismiss phase in both the district and circuit court, and standing was fully litigated at trial on remand); *Miller v. Rite Aid Corp.*, 334 F.3d 335, 343 (3d Cir. 2003) (standing issue raised and considered at the summary judgment phase, but district court held the issue for trial where standing was fully litigated); *Kirola v. City of San Francisco*, 74 F. Supp. 3d 1187, 1234 (N.D. Cal. 2014) ("Kirola has long been on notice that the City disputes whether she has standing and that such determination would be adjudicated at trial."). These are all sound examples of standing as litigated at trial. For example, where standing has been raised in a pre-trial dispositive motion, and the issue is allowed to continue to trial, a plaintiff is fairly on notice that standing is controverted. *See Miller,* 334 F.3d at 339 ("In seeking summary judgment . . . Rite Aid also argued that because Miller was not an ERISA 'participant,' he had no standing to bring an ERISA claim. . . . [T]he District Court granted summary judgment to Rite Aid on the state law

contract claim, but held the ERISA claim over for trial."). In other circumstances, a court may make clear in a pretrial order that an issue will be reserved for trial. *See Kirola*, 74 F. Supp. 3d at 1234 ("Although the City chose not to pursue the standing issue in connection with Plaintiff's class certification motion, the Court's order on that motion expressly stated that a determination of Kirola's standing '[would] be made following trial based upon the evidence presented and the relief requested.'"). In these cases, where the plaintiff is on notice that his standing is at issue and he has a full and fair opportunity to make his case, a court is justified in considering only the evidence adduced at trial.

Here, the district court held that "Defendant did in fact controvert Plaintiff's standing at trial." The court noted that Sabatine testified that he sold "everything" (including presumably the right to the legal claims at issue) and "[t]hereafter, Defendant orally moved for judgment as a matter of law on several grounds, including Plaintiff's failure to supply sufficient evidence of standing." *Cranpark, Inc.*, 2014 WL 3749401, at *7.

This description is an overly generous reading of the proceedings and the sequence of events. The trial consumed one week, starting on Monday and ending on Friday. Sabatine gave the relevant testimony on Tuesday afternoon and Cranpark's proofs ended on Wednesday afternoon. RGI did not make its Rule 50(a) motion until 5:30 p.m. on Thursday, after the close of all the evidence. RGI had earlier opportunities to raise any concern about standing; it could have, for example, put Cranpark on notice of the alleged deficiency by raising a Rule 50(a) motion at the close of Plaintiff's case on Wednesday afternoon.

Furthermore, Rule 50(a) allows for a motion to be filed "at any time before the case is submitted to the jury," and the Advisory Committee Note to Rule 50 states that "the second sentence of paragraph (a)(1) authorizes the court to consider a motion for judgment as a matter of law as soon as a party has completed a presentation on a fact essential to that party's case." Fed. R. Civ. P. 50(a) advisory committee's note to 1991 amendment; *see also* 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2533 (3d. ed. Supp. 2015) (citing *Foster v. Nat'l Fuel Gas Co.*, 316 F.3d 424 (3d Cir. 2003)). Thus, RGI could have identified standing as a controverted issue, giving Cranpark an opportunity to present evidence, either by making its Rule 50(a) motion at the close of Sabatine's testimony or at the close of plaintiff's

case. Because RGI did not do so, and because the court immediately denied RGI's Rule 50(a) motion at the close of evidence (stating, "I think there's enough in there that it's Cranpark's claim"), Cranpark had neither an opportunity nor a reason to place the APA into evidence. Indeed, other circuits have recognized that articulating a defense for the first time in a Rule 50(a) motion for judgment as a matter of law is a "trial-by-ambush tactic." *Int'l Meat Traders, Inc. v. H & M Food Sys.*, 70 F.3d 836, 840 (5th Cir. 1995). We believe that RGI's efforts in this regard were too little, too late.

Moreover, the district court was, perhaps, less than rigorous in observing its duties under Rule 50, which contributed to Cranpark's failure to timely understand the possible deficiency in its proof. Other circuits have recognized that "the trial court has an overlapping responsibility [under Rule 50(a)] to inform the non-moving party of deficiencies in its proof and to afford that party an opportunity to correct any such deficiency." *Waters v. Young*, 100 F.3d 1437, 1441 (9th Cir. 1996). Again the Advisory Committee Note to Rule 50 is instructive: "In no event . . . should the court enter judgment against a party who has not been apprised of the materiality of the dispositive fact and been afforded an opportunity to present any available evidence bearing on that fact." Fed. R. Civ. P. 50(a) advisory committee's note to 1991 amendment. Here, the court not only failed to call the deficiency to counsel's attention in a timely fashion, once RGI finally squarely presented the issue in its renewed motion, the court denied Cranpark's request for an evidentiary hearing. *Cranpark*, 2014 WL 3749401, at *10.

Given these facts, we hold that standing was not sufficiently in controversy to justify the district court's refusal to consider the APA.

C.

In its Rule 50(b) motion, RGI argued that Sabatine's illegal conduct should have barred the promissory estoppel claim. The district court denied the Rule 50(b) motion as to this argument because RGI failed to raise it in its Rule 50(a) motion. RGI now argues that this was error.

It is a "well-established proposition that a post-trial motion for judgment as a matter of law 'is not available at anyone's request on an issue not brought before the court prior to

submission of the case to the jury.'" *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 491 (6th Cir. 2008) (quoting *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir. 1997)). When a party fails to raise an argument in its Rule 50(a) pre-verdict motion, it is precluded from making a Rule 50(b) post-verdict motion on that ground. *Sykes v. Anderson*, 625 F.3d 294, 304 (6th Cir. 2010). It is undisputed that RGI did not include as grounds for its Rule 50(a) motion that Cranpark should be barred from bringing its promissory estoppel claim based on Sabatine's criminal history.

RGI asserts, however, that this case falls within an exception to the rule that applies where the argument presents a question of law and there is no need for additional fact-finding and manifest injustice may arise. RGI, however, fails to cite any case holding that such an exception has been recognized in this Circuit. We decline to establish the exception here.

Additionally, those courts that have recognized some form of this exception have described it in discretionary terms. *See Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 178 (E.D.N.Y. 2012) (a court "may" grant judgment as a matter of law if the exception's conditions are met, and, where the conditions are met, "exercise of this discretion is warranted"). Thus, circuit courts recognizing this exception have given deference to district courts when refusing to consider waived arguments in a Rule 50(b) motion. For example, the Eighth Circuit appears to apply plain-error review for refusals to consider waived arguments. *See Pulla v. Amoco Oil Co.*, 72 F.3d 648, 655 (8th Cir. 1995) ("[W]e note that the district court's analysis of the merits suggests that the district court's failure to consider the merits of Amoco's Rule 50(b) motion did not constitute plain error."). Especially in light of such deference, the district court did not err in refusing to hear this waived argument.

## D.

RGI also argues in its cross-appeal that it should be granted a new trial because the district court refused to instruct the jury that Sabitine's illegal conduct could bar both his promissory estoppel and contract claims. At the outset, we note that any argument that the district court erred as to the contract claim is necessarily harmless because RGI prevailed on the contract claim. As to the promissory estoppel claim, we hold that plain error is the proper

standard of review and that the district court committed no clear or obvious error in declining an illegality instruction.

"No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." *Eaton Aerospace, LLC v. SL Montevideo Tech., Inc.*, 129 F. App'x 146, 151 (6th Cir. 2005) (quoting Fed. R. Civ. P. 51). In light of this rule, this Circuit "review[s] for plain error a district court's refusal to give a party's requested jury instructions when that party failed to raise an objection to the district court's instructions." *Id.* (citing *Woodbridge v. Dahlberg*, 954 F.2d 1231, 1235-37 (6th Cir. 1992)). Plain error review is also appropriate where a party did not propose the jury instruction it now contends should have been given. *Kendall v. City of Canfield, Ohio*, 76 F. App'x 617, 621 (6th Cir. 2003) (citing *Reynolds v. Green*, 184 F.3d 589, 594 (6th Cir. 1999)).

RGI proffered "Proposed Jury Instruction No. 3 (Illegal Contract Defense)." The proposed jury instruction reads: "If you find there was a contract and that the subject matter of the contract or any part of the consideration were illegal, the contract is void and unenforceable." RGI did not proffer an instruction on illegality as it pertains to the promissory estoppel claim. At trial, before the matter was submitted to the jury, RGI objected to the court's decision not to include this instruction, stating, "[w]e had requested a charge on the illegal contract, which we have filed in the case. . . . And that also — applies to both causes of action, contract and promissory estoppel." Thus, it appears that while RGI objected as to both the contract and promissory estoppel claim, it only actually proposed an instruction for the contract claim. Plain error review therefore applies to the failure to supply an instruction on the promissory estoppel claim.

Applying plain error review, it is not clear or obvious that the promise at issue in this case grew "immediately out of and in connection with an illegal or immoral act," as required by Ohio law. *Orth v. Lauther*, 120 N.E.2d 313, 316 (Ohio Ct. App. 1953). Sabatine's conduct with respect to third parties—Congressman Traficant and representatives of Norfolk Southern—does not appear to have rendered the subject matter *of the contract* or any part of the consideration *for the contract* illegal, and so was not integrally connected to the substance of the joint venture

between Hardrives and RGI. The trial court concluded the same in its pretrial opinion and order denying RGI's motion to dismiss, stating, "that transaction or its existence has no bearing on the legality or consideration of the instant alleged agreement between Plaintiff and Defendant." The trial court did not commit plain error.

E.

The parties agree that the district court erred in not issuing a conditional ruling on RGI's Rule 59 motion for a new trial as required by Federal Rule of Civil Procedure 50(c)(1). That rule provides:

> If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed. The court must state the grounds for conditionally granting or denying the motion for a new trial.

Fed. R. Civ. P. 50(c)(1). Given the district court's failure to follow that mandate, this Court has discretion to decide the motion itself or remand the case for the district court to decide. *Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 604 (6th Cir. 2013). In the interest of judicial efficiency, we will deny the motion here.

"A new trial is appropriate when the jury reaches a 'seriously erroneous result as evidenced by (1) the verdict being against the [clear] weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e. the proceedings being influenced by prejudice or bias.'" *Decker v. GE Healthcare Inc.*, 770 F.3d 378, 394-95 (6th Cir. 2014) (alteration in original) (quoting *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 509 (6th Cir. 2013)). "[N]ew trials are not to be granted on the grounds that the verdict was against the weight of the evidence 'unless that verdict was unreasonable.'" *Id.* (quoting *Barnes v. Owens-Corning Fiberglass Corp.*, 201 F.3d 815, 820-21 (6th Cir. 2014)).

RGI advances its motion for a new trial on two grounds: (1) the clear weight of the evidence refutes liability on the promissory estoppel claim; and (2) the damage award has no legal basis and is not supported by the evidence.

As to the first ground, RGI argues that the jury could not, as a logical and legal matter, be correct in finding that there was no contract and that there was a promise sufficient to form the basis of a promissory estoppel claim. This is so because the only issue in contention regarding the breach of contract claim, RGI argues, was whether Cranpark could point to any promise that would constitute the basis of a contract. Because the jury found that there was no contract, it must have concluded there was no promise, and with no promise there can be no promissory estoppel liability either. This argument is flawed, however, because the jury interrogatories asked the jury to decide if a contract had been formed *on September 1, 1998*, the day the parties met and wrote out their plans for the joint venture. Thus, the jury could have found that RGI made a promise sufficient to form the basis for their promissory estoppel claim sometime after that date.

We need not linger long on this matter, as it seems reasonably clear that the jury looked to events occurring after September and found a promise. Specifically, the jury may have focused on December of 1998—the month Sabatine purchased the expensive asphalt plant that was a key component of the joint venture—as the basis for its verdict. The question for this Court is whether it would be unreasonable for a jury to conclude that whatever communication occurred in December between Sabatine and Tom Stump, RGI's agent, amounted to a promise to move forward as planned with the joint venture. RGI contends that Sabatine's testimony at trial would not allow a jury to make a reasonable inference that a promise was made. The testimony was as follows:

> Q: Let me ask you the question. You said to Tom words to the effect of, "I'm ordering the plant," right?
> A. Yes.
> Q: Tell me, without characterizing them, what words, if any, Tom spoke in return to you.
> A. I don't remember the exact words, but he was very, very excited about—
> Q: No, just tell me the words. What words did he use?
> A: I think he said, "Great."
> Q: Okay. What else did he say?
> A: I don't remember what else he said about that.

RGI is right to argue that the word "great" by itself, has no hallmarks of a "specific," "clear" and "unambiguous" promise necessary to support a promissory estoppel claim. However, it is less

clear that a jury would be unreasonable to conclude that a promise was made during this conversation. Sabatine stated that he didn't remember the exact words, and because Sabatine proceeded with the purchase the $1.5 million plant following this conversation, it is not an unreasonable inference that all of whatever was said during this conversation created in Sabatine a reasonable belief that RGI was on board and that they had a deal.

RGI also argues that because Sabatine knew the agreement was subject to RGI's senior management approval, he could not have reasonably relied on any promise from Tom Stump or RGI without getting that approval. However, Cranpark elicited testimony from Tom Stump indicating that RGI senior management had reviewed, approved, and even modified the agreement. (Question: "So it's reasonable to conclude that one of the changes involving senior management approval was the increase from 210- to 300, that's a reasonable conclusion, isn't it?" Answer: "I suppose.") In sum, it was not unreasonable for the jury to conclude that a promise was made sometime after September 1, 1998.

The second ground advanced in support of RGI's motion for a new trial is that the award had no legal basis and is not supported by the evidence. This court's review of a jury's damage award is "extremely deferential, and we will not order a remittitur or a new trial unless the award is 'contrary to all reason.'" *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 413 (6th Cir. 2006) (quoting *In re Lewis*, 845 F.2d 624, 635 (6th Cir. 1988)). RGI argues that the jury instructions only allowed the jury to award reliance damages, but given the large award, $15.6 million, the jury must have award expectation damages, as well. RGI's argument fails.

Neither party objected to the court's instructions, nor do they dispute them now. Instead, RGI argues that the jury must have relied on the damage analysis proffered by Dr. John Burke, Cranpark's damages expert, and his model assumed that the parties' joint venture deal actually succeeded and continued on for ten years. In that case, the jury would have been awarding expectation damages, which were not allowed based on the jury instructions.

The evidence however does not compel this conclusion. Tax returns showed that Cranpark's predecessor, Hardrives, earned $435,476 in 1998. As Cranpark points out, assuming Hardrives experienced no growth whatsoever (making this estimate a conservative one), the

company would have total lost profits of roughly $6.532 million dollars in the 15 years leading up to trial. Additionally, Dr. Burke opined that Hardrives was worth $12,064,025 in 1998, around the time of the alleged breach, and was sold for about $4.7 million in 2001. The difference in these numbers suggests that Hardrives value fell by about $7.364 million. Those combined losses total approximately $13.9 million.

RGI argues that these damages are inconsistent with the jury instructions. We disagree. The relevant instruction stated, "Plaintiff is entitled to recover the amount of damages necessary to place it in the same position as if the contract had not been made." This would include lost profits and lost value in the business measured as the difference between the condition of the company had no contract been contemplated and the condition of the company after the breach. Indeed, Ohio law abides by the majority understanding of reliance damages: "The reliance interest represents the detriment [the promisee] may have incurred by changing his position." *ZBS Industries, Inc. v. Anthony Cocca Videoland, Inc.*, 637 N.E.2d 956, 960 (Ohio Ct. App. 1994) (alteration in original) (quoting Calamari and Perillo, *Contracts* 522 (2d ed. 1977)).

RGI relies heavily on the section of the instruction that states, "[t]hese damages include expenditures made in preparation for performance or in performance of the contract." But this sentence is merely explanatory, and does not limit the jury to awarding damages only for such expenditures.

RGI also complains about particular aspects of Cranpark's proofs as to lost profits. For example, RGI argues that Cranpark's loss values do not account for Cranpark losing its limestone supplier near the end of 1998, and that Sabatine could well have been barred from obtaining future government contracts because of his illegal activity. These are all arguments that RGI could have, and for the most part did, make to the jury. This court has no reason to conclude that the jury did not consider these and other facts presented by RGI at trial when deciding the damages award.

In addition to the $13.9 million in lost profits and value, the jury could have considered the cost of the new asphalt plant, and Cranpark's expenditures in preparing the new location in Youngstown. According to testimony at trial, these expenditures cost the company

approximately $3 million in total. RGI argues that these costs are due to Cranpark's failure to try to return to its old business model once the Youngstown deal fell through, but this is no more than a rehash of the claim that Cranpark failed to mitigate, decided in the jury's Interrogatory No. 8: "Did Defendant prove by a preponderance of the evidence that Plaintiff failed to mitigate its damages?" Answer: "No." Mitigation requires only reasonable efforts, not actual success. *See Barclays Am./Commercial, Inc. v. ROYP Mktg. Grp.*, 573 N.E.2d 1115, 1121 (Ohio Ct. App. 1988). The jury could have concluded that by the time Sabatine understood that RGI was pulling out of the joint venture, he was too far along in moving his business to change course.

Thus, having established that the jury might reasonably have found over $13 million in lost profit and value, and $3 million in expenditures based on Cranpark's attempts to move to the Youngstown location, we cannot say that the jury's award of $15.6 million was "contrary to all reason." *See Mike's Train House, Inc.*, 472 F.3d at 413. Additionally, where evidence supports a jury's award, courts will not infer that a lump-sum verdict included impermissible types of damages. *Kessinger v. Grefco, Inc.*, 875 F.2d 153, 158 (7th Cir. 1989); *Chandler v. Bombardier Capital, Inc.*, 44 F.3d 80, 83-84 (2d Cir. 1994).

RGI's motion for a new trial is denied.

F.

Finally, Cranpark argues that it is entitled to prejudgment and post-judgment interest if the jury verdict is reinstated. Interest on a judgment is provided for by Ohio Revised Code § 1343.03(A), which states:

> [W]hen money becomes due and payable upon a bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest . . . .

Determining whether and in what amount to award prejudgment or post-judgment interest involves both legal and factual determinations. *See Andersons, Inc. v. Lafarge N. Am., Inc.*, 503 F. App'x 314, 321 (6th Cir. 2012). "The amount awarded is based on the court's factual

determination of an accrual date." *Norco Equip. Co. v. Simtrex, Inc.*, No. 95914, 2011 WL 3211102, at ¶ 12 (Ohio Ct. App. July 28, 2011). Because the jury likely awarded damages based on losses that occurred over a span of years and thus claims for certain losses arguably accrued at different times, if Cranpark is entitled to prejudgment interest, an evidentiary hearing is likely required to determine the proper amount of prejudgment interest owed. Thus, remand to the district court on this matter would be the best course.

RGI, however, makes two arguments that, if correct, would wholly preclude Cranpark from obtaining prejudgment interest. First, RGI argues that promissory estoppel claims do not fall within the "contract or other transaction" language of § 1343.03(A), precluding prejudgment interest. Ohio precedents conflict on this point, and both parties cite Ohio Court of Appeals cases that stand for opposite propositions of law. *Compare Cervelli v. Health Enters. of Am., Inc.*, No. 89-T-4329, 1991 WL 16545, at *4 (Ohio Ct. App. Feb. 8, 1991) (no prejudgment interest for promissory estoppel claims) *with Magnum Steel & Trading, LLC v. Mink*, Nos. 26127, 26231, 2013 WL 2713268, at *15 (Ohio Ct. App. June 12, 2013) ("Magnum prevailed on its promissory estoppel claim, so it was entitled to prejudgment interest."); *Shampton v. City of Springboro*, Nos. CA2000-08-080, CA2000-09-081, 2001 WL 1403051, at *15 (Ohio Ct. App. Nov. 13, 2001) (upholding prejudgment interest award on promissory estoppel claim) *rev'd on other grounds*, 786 N.E.2d 883 (Ohio 2003).

Responding to this first argument, Cranpark notes that promissory estoppel is a quasi-contract theory and a number of Ohio and federal cases hold that other quasi-contract theories, such as unjust enrichment and quantum meruit, trigger the entitlement to prejudgment interest under § 1343.03(A). *See Desai v. Franklin*, 895 N.E.2d 875, 888 (Ohio Ct. App. 2008); *Wuliger v. Cannella Response TV, Inc.*, 865 F. Supp. 2d 836, 848-49 (N.D. Ohio 2011). Again, the Ohio precedents conflict, and RGI cites Ohio Court of Appeals cases holding that the statute does not allow for prejudgment interest on quasi-contract claims like unjust enrichment. *See Cantwell Mach. Co. v. Chicago Mach. Co.*, 920 N.E.2d 994, 999 (Ohio Ct. App. 2009). The line of cases on which RGI depends, however, rests upon an interpretation of the "verbal contracts" portion of the statute, which Ohio courts have held requires privity, and privity does not exist when an action arises by operation of law (as in quasi-contract). *See Servpro of Ne. Columbus v.*

*Reconstr., Inc.*, No. 90AP-1400, 1991 WL 224489, at *4 (Ohio Ct. App. Aug. 22, 1991) (citing *Maint. Unlimited, Inc. v. Salemi*, 480 N.E.2d 113, 119 (Ohio Ct. App. 1984) ("The record fails to disclose any allegation by appellee that it was in privity, or that it had an oral contract with Salemi. Its actions against Salemi arises not under a verbal contract, but by operation of law. Thus R.C. 1343.03(A) is not applicable. . . .")). The cases Cranpark cites, which do allow for prejudgment on quasi-contract claims, rest on the section of § 1343.03(A) that allows prejudgment interest on "judgments . . . arising out of a contract or other transaction." *See Desai*, 895 N.E.2d at 887. This is the statutory language that is at issue in this case. Thus, as a matter of Ohio law, Cranpark has the better argument; that is, that Ohio law does allow for prejudgment interest on quasi-contract claims like promissory estoppel.

Second, RGI contends that § 1343.03(A) authorizes only post-judgment interest for all types of contract claims. However, Ohio courts and this Circuit have routinely recognized an entitlement to prejudgment interest whenever damages are awarded in a breach of contract case. *See e.g.*, *Tharo Sys., Inc. v. Cab Produkttechnik GMBH & Co. KG*, 196 F. App'x 366, 377 (6th Cir. 2006) (citing *Royal Elec. Constr. Corp. v. Ohio State Univ.*, 652 N.E.2d 687 (Ohio 1995)). We recently confirmed that understanding of Ohio law in *Broad St. Energy Co. v. Endeavor Ohio, LLC*, 806 F.3d 402, 409 (6th Cir. 2015). As to a breach of contract claim, "a 'favorable judgment award' [gives] 'a right . . . to an interest award as a matter of law.'" *Id.* (citing *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 693 (6th Cir. 2000)). In *Broad Street Energy Co.*, a favorable judgment on its breach of contract claim "entitled [plaintiff] to 3% prejudgment interest on the award under Ohio law." *Id.* We hold that Cranpark is entitled to prejudgment interest, but remand to the district court for a determination of the amount of interest to be awarded. That determination will include the amount of post-judgment interest to which Cranpark is entitled under Ohio law and 28 U.S.C. § 1961.

III.

Accordingly, we REVERSE the trial court's standing determination; AFFIRM its decision to partially deny RGI's Rule 50(b) motion and its decision to not instruct the jury on Sabatine's illegal conduct; DENY RGI's motion for a new trial; and REMAND the case with instructions to reinstate the jury verdict and calculate the interest owed on the judgment.