RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0279p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BROAD STREET ENERGY COMPANY,

        *Plaintiff-Appellee/Cross-Appellant,*

    *v.*

        Nos. 14-4223/4278

ENDEAVOR OHIO, LLC,

        *Defendant-Appellant/Cross-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:12-cv-00711—Algenon L. Marbley, District Judge.

Argued: October 14, 2015

Decided and Filed: November 13, 2015

Before: BOGGS, SUTTON, and COOK, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Mark A. Vander Laan, DINSMORE & SHOHL, LLP, Cincinnati, Ohio, for Appellant/Cross-Appellee. Kathleen M. Trafford, PORTER WRIGHT MORRIS & ARTHUR LLP, Columbus, Ohio, for Appellee/Cross-Appellant. **ON BRIEF:** Mark A. Vander Laan, Robert M. Zimmerman, DINSMORE & SHOHL, LLP, Cincinnati, Ohio, for Appellant/Cross-Appellee. Kathleen M. Trafford, James D. Curphey, David S. Bloomfield, Jr., L. Bradfield Hughes, PORTER WRIGHT MORRIS & ARTHUR LLP, Columbus, Ohio, for Appellee/Cross-Appellant.

_____

**OPINION**

_____

SUTTON, Circuit Judge. Two sophisticated parties negotiated an agreement for one to buy oil-and-gas leases from the other for $35 million. Three months after signing, the buyer

unilaterally terminated the agreement. A jury found that the buyer had no right to terminate in this way and awarded the seller the $3.5 million escrow payment and interest on it. We affirm.

I.

For some time, Broad Street Energy Company has owned many oil-and-gas leases in northeast Ohio. In recent years, that market has changed, leading many to launch shale-drilling (often called fracking) initiatives designed to extract oil and gas from shale formations that typically lie much deeper below the surface than the underground formations from which Broad Street (and others) have extracted oil. The type of land ownership needed for conventional oil-well drilling often differs from the forms of ownership needed for fracking. In this instance, the record shows that fracking requires leases of at least 640 acres, as opposed to the 20-to-40-acre leases that Broad Street required for its conventional wells. Endeavor Ohio was formed to obtain access to the oil and gas in Ohio's shale and to buy the land for doing so.

In April 2012, the two companies agreed that Endeavor would pay $35 million for many of Broad Street's leases along with the wells, pipelines, and related property connected to them. As part of the agreement, Endeavor put up $3.5 million in escrow that would go toward the $35 million purchase price due at closing, slated to take place 120 days after the parties signed the agreement.

Another part of the agreement said that Broad Street, upon signing, would deliver a list of the assets it was selling, including any limitations on Broad Street's title. Between the signature date and closing, Endeavor had the right to undertake due diligence to determine if any "Title Defects" existed—if "any lien, encumbrance, claim, defect in, or objection to real property title . . . renders [Broad Street's] title to any Lease, Unit, Well, or Easement less than" "clear and uncontested record title." R. 1-1 § 4.1(a), (c). In the event a title defect emerged, the agreement contemplated that Endeavor would inform Broad Street of the problem and estimate its impact on the lease's value. If Broad Street disputed the alleged title defect or its value, the parties would resolve the dispute with "good faith negotiations" or, if needed, "binding arbitration." *Id.* § 4.6. The agreement also set forth what would happen if title defects remained: (1) Broad Street could fix them before closing or accept a lower purchase price; or (2) if the total value of

the title defects reduced the total value of the assets by at least 30%, either party could terminate the agreement.

At signing on April 9, 2012, Broad Street, as promised, delivered the list of assets to Endeavor. Endeavor, as expected, began its due diligence, sending a fleet of lawyers to Broad Street's offices to comb through the land records and to make other related inquiries. On July 9, 2012, Endeavor told Broad Street by letter that it had found title defects that affected 40% of the leases and reduced the value of the assets by 55%. Endeavor did not seek more information from Broad Street about the title defects or their value or invoke the dispute-resolution process for dealing with any disagreements. It instead terminated the agreement on the ground that its research showed that the title defects reduced the value of the assets by at least 30%.

Broad Street wrote back several times, disputing many statements in the letter and insisting on closing the deal or at least implementing the dispute-resolution procedures in it. When Broad Street never got a response, it sued Endeavor. It claimed that Endeavor had breached the agreement and that Broad Street was entitled to the $3.5 million escrow payment as well as other remedies. Endeavor denied any breach and counterclaimed that Broad Street had breached the contract.

The case went to trial. A jury found that Endeavor had breached the contract and awarded Broad Street the $3.5 million escrow payment. The district court added just over $209,000 in prejudgment interest and ordered Endeavor to pay post-judgment interest until it satisfied the judgment. Both parties appealed. Endeavor claims it should get a new trial or at least not have to pay any interest on the judgment. Broad Street claims it should get more than just the escrow as damages.

II.

A.

We start with Endeavor's request for a new trial on the ground that the breach-of-contract verdict was against the weight of the evidence, a claim that receives abuse-of-discretion review. *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 584, 591 (6th Cir. 2015). To obtain relief, Broad Street had to prove that Endeavor had a duty to do something in the future

(by continuing toward closing) but wrongfully refused to do it (by terminating the contract). *Se. Land Dev., Ltd. v. Primrose Mgmt., L.L.C.*, 952 N.E.2d 563, 569 (Ohio Ct. App. 2011). No one doubts that Endeavor's letter refused future performance. The question is whether the refusal was wrongful. To make that showing, Broad Street had to establish that (1) Endeavor had no right to terminate the agreement, and (2) Broad Street had not already materially breached the agreement, *see Jackson v. State Farm Fire & Cas. Co.*, 461 F. App'x 422, 426 (6th Cir. 2012). The jury could reasonably find that Broad Street proved both.

*Did Endeavor have the right to terminate the contract?* In considering this argument, we need not consider every theory of breach (there were four) and every response. All that matters is whether at least one theory of breach fits the bill—whether at least one theory supports the jury's general verdict. One such theory is Broad Street's claim that the contract did not permit Endeavor to terminate the contract unilaterally based on its own assessment of any title defects in Broad Street's properties and the value of them.

Endeavor and Broad Street agree that the purchase agreement gave each party the option to walk. The question was when and under what circumstances. According to Endeavor, § 10.1(b) of the agreement gave it the option to end the contract at any point based on its own determination that the value of title defects exceeded 30% of the purchase price. According to Broad Street, the parties could invoke this provision only after adhering to the process laid out in § 4 of the agreement for determining the value of any title defects.

Broad Street has the better of the argument—sufficiently better that we do not think that the issue should have been submitted to the jury in the first place. The key point is that § 10.1(b) of the contract—the termination provision—does not stand alone. It incorporates other parts of the agreement, including most importantly § 4. The operative part of § 10.1(b) says that the buyer or seller may terminate the agreement at any point "in the event that the aggregate amount of all Title Defect Values equals or exceeds 30% of the unadjusted Purchase Price." The phrase Title Defect Values, as its capitalization suggests, is a defined term—defined first of all in § 4.1(d). One thus cannot apply § 10.1(b)—indeed one cannot even understand it—without considering § 4. The animating point of § 4 in this regard, it turns out, is to set forth a process for identifying title defects, assessing their value, creating a mechanism for lowering the

purchase price to account for them, and establishing a dispute-resolution process for ironing out any disagreements along the way. While § 4.1(d) defines Title Defect Values, that section and § 4.1(c) describe how to determine title defects and their value. Then § 4.2(b) explains how Title Defect Values established under procedures laid out in § 4.2 may require the parties to lower the purchase price to account for the true value of what was being sold. And § 4.6 provides a dispute-resolution procedure for clearing up any disputes. All that § 10.1(b) does in this context is say that, once the Title Defect Values have been established under § 4, both parties can walk if the lowered price changes the original purchase price by 30% or more.

Nothing in § 4 gives either party the right to determine unilaterally what the Title Defect Values are and whether they exceed 30% of the value of the purchase agreement. And, notably, the provisions in § 4 would serve no purpose if Endeavor could unilaterally decide the number of title defects and value of them, then invoke the termination provision on the ground that the value of the defects exceeded the 30% threshold for terminating the agreement.

In Ohio, as elsewhere, courts do their best to give a fair reading to the contract, one requirement of which is to give content where possible to each term of the contract. *See Farmers' Nat'l Bank v. Del. Ins. Co.*, 94 N.E. 834, 839 (Ohio 1911). Broad Street's interpretation honors this imperative; Endeavor's does not. How could one understand the meaning of Title Defect Values without considering § 4? And what would be the point of all of these § 4 processes for assessing Title Defect Values if either party could terminate the agreement based on its *own* assessment? It is not clear why, if Endeavor is right, Broad Street did not have an equal right unilaterally to say that the Title Defect Values were less than 30% of the purchase price. What then? How would a court (or for that matter a jury) know which unilateral assessment to prefer? In the last analysis, § 10.1(b) provides a unilateral termination right for the buyer or seller—but only after the parties determine under § 4 whether the Title Defect Values exceed 30% of the original purchase price.

Endeavor advances other ways to read the agreement. It first invokes the preamble to § 10.1, which says that each of the enumerated termination rights applies "[a]t any time commencing on the date hereof and ending upon the occurrence of the Closing" and "notwithstanding anything contained in this Agreement to the contrary." How, Endeavor asks,

could it exercise the termination right in § 10.1(b) "at any time" if it must adhere to the notice and other time-consuming requirements in § 4?  The answer is that not every enumerated termination right had to be available at all times from the signing of the agreement to the closing. Nor does this approach read the "at any time" language out of the agreement.  It is part of a preamble that covers other termination rights—such as "acts of God," R. 1-1 § 10.1(a), or takings under eminent domain—that could apply the moment the ink on the purchase agreement dries.

Endeavor next points to § 10.1(b) itself, which says that the parties' termination right under this provision exists "notwithstanding anything contained in Article IV to the contrary." Doesn't this language, Endeavor insists, show that § 4 is irrelevant if a party unilaterally decides that the Title Defect Values exceed 30% of the purchase price?  The answer is that the "notwithstanding" clause does not make *everything* in § 4 irrelevant to § 10.1(b).  It establishes that, once the 30% threshold is hit after applying the § 4 processes for determining Title Defect Values and for accordingly lowering the purchase price, either party may terminate the agreement if it is not satisfied with the new purchase price.  That reading gives fair meaning to everything in § 4 and § 10, does not diminish or effectively erase any provision, and makes considerable sense.  Endeavor had no right to terminate the contract on this basis.

*Did Broad Street materially breach the agreement before Endeavor terminated it?*  That does not end matters.  If Broad Street breached the agreement from the start, Endeavor had a right to terminate and a basis for bringing a counterclaim as well.  Endeavor argued that Broad Street committed "a breach from day one," because it "knew" it did not own 100% of the leases it was selling, despite "represent[ing]" that it did in Exhibit A of the agreement.  R. 81 at 36, 38.

Here are the relevant parts of the agreement.  Exhibit A lists the leases that Broad Street was selling, "including all of [Broad Street]'s [ownership]" as described there.  R. 1-1 § 1.2(a). The exhibit describes Broad Street's ownership as "100%."  *Id.* at 61–62.  The agreement adds that Broad Street, "[t]o [its] knowledge, . . . owns the right, title, and interest in and to each of the Leases as set forth on Exhibit 'A,'" *id.* § 5.5, and Endeavor is only obligated to close if, at the time of closing, this statement remains true and Broad Street has performed as specified in the agreement.  Other exhibits and schedules list additional assets being sold (wells, pipelines, and

other property) as well as contracts that could affect Broad Street's title to its assets. The agreement also says that a disclosure *anywhere* in the agreement applies *everywhere*.

Even if Exhibit A listed leases that Broad Street did not own in full, as the evidence showed, the jury reasonably could decide that Broad Street did not breach the agreement. Other exhibits disclosed what Broad Street owned and what it did not. One showed that Broad Street had less than 100% ownership in many of the wells it was selling, and another listed at least ten contracts that "relat[e] to the *ownership* or operation of any" asset being sold. *Id.* § 5.14(ii) (emphasis added). And the agreement's statement that a disclosure in one place amounted to a disclosure everywhere would show that the requisite disclosure had occurred. Broad Street's President testified about these other provisions and explained that figuring out title to oil-and-gas leases is notoriously difficult. Indeed, it is so difficult that title insurance on them is not available in Ohio. He explained that the plan all along, as understood by both parties, was that Broad Street would sell what it had "warts and all." R. 79 at 137. Broad Street's obligation, as he understood it, was to disclose the warts it knew of, something it did across all of the exhibits and schedules, even though this knowledge was hampered because Broad Street had not done extensive diligence when *it* bought the leases. A reasonable jury could accept Broad Street's explanation, finding that, even if Exhibit A was wrong, other disclosures qualified the error. That is particularly so with respect to leases of this sort where, as the rest of the agreement shows, the parties well knew that determining title could be difficult—and might well be in this instance.

There was, to be sure, testimony going the other way, some of which suggested that the failings of Exhibit A created a material breach by Broad Street. Endeavor's general counsel said that the company found that Broad Street had less than 100% ownership of more than 40% of its leases. But of course this assessment was never measured by the processes laid out in § 4 for determining Title Defect Values and accordingly a jury could discredit some or all of it. Several officers of Endeavor agreed that 100% ownership was critical for them and one said that this was communicated to Broad Street. But that testimony does not wipe out the other disclosure provisions or require a reasonable jury to accept the testimony, as opposed to Broad Street's testimony that both parties understood that the company was selling the leases "warts and all."

Endeavor in the end has not met the high threshold for showing that the district court abused its discretion in denying a motion for a new trial.

B.

*Summary judgment.* In addition to arguing that the district court should have granted a new trial, Endeavor maintains that it should have won as a matter of law at summary judgment. There is some debate over whether a party may renew a summary judgment motion after a jury trial, as opposed to seeking judgment as a matter of law after the trial (and if unsuccessful, appealing that). Be that as it may, both of Endeavor's legal arguments fail anyway. It first argues that § 10 of the contract as a matter of law gave Endeavor the right to terminate it if the company determined that the Title Defect Values exceeded 30% of the purchase price of the agreement. As just shown, *Broad Street* should have prevailed as a matter of law on this point. Necessarily, or *a fortiori* as lawyers like to say, Endeavor cannot win as a matter of law on this score. As for Endeavor's argument that Broad Street's failure to own 100% of the leases listed in Exhibit A establishes a breach from the outset as a matter of law, the relevant contract provisions pointed in different directions and so for that matter did the testimony. The district court properly let this issue go to a jury.

*Evidentiary ruling.* Endeavor argues that the district court erred when it excluded evidence related to the title defects. When Endeavor delivered its termination letter to Broad Street, it included a box of documentation. The district court excluded the documentation, citing the possibility of "unnecessary confusion for the jury." R. 70 at 6. A court may exclude evidence on this basis if the "probative value is substantially outweighed by a danger of . . . confusing the issues." Fed. R. Evid. 403. The probative value of this evidence was low because it was cumulative. As it was, the jury heard testimony from Endeavor witnesses that over 40% of Broad Street's leases had title defects. The documentation would have served the same end. Plus, the possibility the evidence might confuse was not insignificant. The documentation was dense and highly technical, and included legal opinions, lease assignments, land records, and spreadsheets. The district court decided that the possibility of confusion outweighed the probative value of the evidence. We accord that judgment "great deference,"

*United States v. Stafford*, 721 F.3d 380, 395 (6th Cir. 2013), and the court's discretion was not exceeded here.

III.

Endeavor next challenges the $209,215.59 of prejudgment interest added to the award and the order to pay post-judgment interest until the judgment is satisfied.

*Prejudgment interest.* Ohio law governs, *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 633 (6th Cir. 2000), and it supplies a straightforward rule. Broad Street received a "favorable judgment award," giving it "a right . . . to an interest award as a matter of law." *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 693 (6th Cir. 2000). That entitled Broad Street to 3% prejudgment interest on the award under Ohio law, which is just what the district court gave. Ohio Rev. Code §§ 1343.03(A), 5703.47.

Endeavor responds through a form of a confession and avoidance. It confesses that the statute normally gives Broad Street this right. But it tries to avoid the result that normally follows by noting that a written contract can override the 3% rate or eliminate it altogether. *Id.* § 1343.03(A). Endeavor claims that the escrow agreement is just such a written contract. It directs a bank to hold the $3.5 million and provides that the bank will hold the funds "in a non-interest bearing account." Trial Ex. P-6 § 2. As Endeavor sees it, that provision displaces the statutory rate.

That is not the case, as we see it. Ohio limits the types of agreements that override the default rate. The escrow agreement can only do so if it "specif[ies] a rate of interest with respect to past due accounts." *Hobart Bros. v. Welding Supply Serv., Inc.*, 486 N.E.2d 1229, 1232 (Ohio Ct. App. 1985). The escrow agreement did not say that; it just said the bank would never have to pay interest on the $3.5 million deposit. This provision applied whether or not the funds were "past due" and regardless of who ended up receiving them. The escrow agreement had little in common with the types of agreements that Ohio courts allow to override the statutory rate. *See, e.g., Ohio Valley Mall Co. v. Fashion Gallery, Inc.*, 719 N.E.2d 8, 9, 11 (Ohio Ct. App. 1998) (holding that a lease that "required that the tenant pay interest at eighteen percent per annum or

the maximum interest rate permitted by law on all past-due amounts" displaced the statutory rate). Broad Street is entitled to 3% prejudgment interest on the award.

*Post-judgment interest*. Federal law governs, *FDIC v. First Heights Bank, FSB*, 229 F.3d 528, 542 (6th Cir. 2000), and it too creates a straightforward rule. "Interest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). Endeavor again claims the escrow agreement displaces the federal rate—here 0.1%. *See id.* We disagree for two reasons. First, even if we were to read the interest rate in the escrow agreement to relate to interest due *under a contract*, it would have nothing to do with interest due *on a judgment*. *See Kotsopoulos v. Asturia Shipping Co.*, 467 F.2d 91, 95 (2d Cir. 1972). And second, allowing the (loosely related) escrow agreement to displace post-judgment interest undermines the statute's objective of "compensat[ing] the successful plaintiff for being deprived of compensation for the loss from the time between ascertainment of the damage and the payment by the defendant." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835–36 (1990). The escrow agreement once again does not override the federal statutory rate.

IV.

That leaves Broad Street's cross-appeal. The company argues that it should be able to recover more than the $3.5 million escrow (plus interest) as damages. The short answer is that Broad Street never made this argument below and thus may not raise it now. The longer answer is that Broad Street argued at summary judgment that it was entitled to specific performance of the purchase agreement and, if not that, to "damages." R. 15 at 13–14. The district court rejected Broad Street's specific-performance argument, and Broad Street has not appealed the point here. As for damages, Endeavor responded that at most Broad Street would be entitled to the escrow amount of $3.5 million. The district court then ruled that Broad Street's damages, if it established a breach, would be limited to the $3.5 million escrow amount. Broad Street never argued that, if it could not obtain specific performance, it was entitled to more damages—either in its summary judgment reply brief, in its trial briefs, or during the jury-instruction conference. Nor does this seem to have been a mistake. One could well imagine the strategic benefits of leaving damages at the $3.5 million escrow figure and avoiding the kinds of push-and-pull

complications that would arise at trial over assigning values to the leases—and separating that point from one of Endeavor's main defenses.

For these reasons, we affirm.