**Aubrey WILLACY, Plaintiff-Appellant,**

v.

**Thomas MAROTTA; Timothy Marcovy; Salvatore LoPresti; LoPresti, Marcovy & Marotta, LLP, Defendants-Appellees.**

### No. 16-3351

United States Court of Appeals, Sixth Circuit.

Filed March 24, 2017

Michael P. Harvey, Law Office, Rocky River, OH, for Plaintiff-Appellant

Victor Dennis Radel, Thrasher, Dinsmore & Dolan, Cleveland, OH, for Defendants-Appellees

BEFORE: MOORE, SUTTON, and WHITE, Circuit Judges.

SUTTON, Circuit Judge.

Aubrey Willacy and Salvatore LoPresti practiced law together for decades. When Willacy retired and moved to Florida, he wanted more money for his share in the partnership than LoPresti and the new partners were willing to pay. LoPresti, Marcovy, and Marotta dissolved the firm and initiated arbitration, as the partnership agreement allowed. The district court rightly allowed the arbitrator to resolve the partners' claims, and we remand the case only to assess whether Willacy deserves prejudgment or post-judgment interest.

I.

In 1979, Willacy and LoPresti, both practicing lawyers, formed a partnership under Ohio law. Realizing how little in this world lasts, they agreed that "[t]he partnership shall be dissolved upon the demand of either of its partners, in which event the partners shall proceed with reasonable promptness to liquidate and terminate the partnership business." R. 28-2 at 7. The partnership agreement did not spell out how to distribute the dissolved partnership's assets. But it did say that, "[i]f the partners are unable to agree upon the method and de[ ]tails of liquidating the partnership business, the controversy shall be settled by arbitration in accordance with the rules of the American Arbitration Association, and judgment upon the award may be entered in any court having jurisdiction thereof." *Id.* at 7–8.

Timothy Marcovy joined the partnership in 1984, prompting the firm to change its name to Willacy, LoPresti & Marcovy. R. 11 at 3. A 2007 amendment to the partnership agreement resolved the partners' dispute about how much capital Marcovy needed to contribute to pay for his stake in the partnership. That amendment set the firm's valuation at $1,250,000, stated that Willacy was to receive his 52% share in equal annual payments over ten years, and provided that the capital-return payments would stop if the firm dissolved. *Id.* at 4; R. 28-3 at 6. The amendment also admitted Thomas Marotta to the partnership and explained how the firm would compensate partners in transitional and full retirement. *Id.* at 1–5. Willacy entered transitional retirement on January 1, 2008, eventually moving to Florida. R. 11 at 2, 5.

A 2009 amendment to the partnership agreement tried to quell a conflict over Willacy's retirement compensation and Marcovy and Marotta's partnership buy-in payments. *See* R. 1-3. This amendment reduced the firm's valuation by introducing an annual valuation based on gross collections. Instead of getting better, things got worse, prompting another amendment to

the agreement in 2010. *See* R. 1-4. The 2010 amendment specified that "[a] retiring partner shall receive an amount equal to one-half of the draw received by the non-retiring partners, to be paid at the same time and in the same manner as such draws are paid to the non-retiring partners." *Id.* at 1. The partners stipulated "that, as of the date of [the 2010] amendment, the amount of draw payments being made to non-retiring partners is One Thousand Five Hundred dollars ($1,500) per week," but they also agreed that a majority of the partners could change the frequency and size of the non-retiring partners' draws at any time. *Id.* at 2.

That did not fix things either. Willacy sought over half a million dollars from his partners—what he felt he was owed based on his remaining interest in the firm at the $1,250,000 valuation. R. 11 at 10. But LoPresti, Marcovy, and Marotta were willing to buy him out for only $25,000. *Id.* at 11. Unable to bridge the gap and daunted by the recession's impact on the firm's finances, LoPresti, Marcovy, and Marotta dissolved the firm on July 1, 2014. *See* R. 1-5. LoPresti, Marcovy, and Marotta estimated that the dissolution entitled Willacy to "about $33,500.00, if the disputed half draws are included." R. 1-6 at 2. On July 17, the three partners offered to pay Willacy either (1) "$20,000 within 30 days … and $1,000/month for 30 months thereafter, for a total of $50,000"; or (2) "$60,000, paid at $1,000/month, over 60 months." *Id.* Willacy rejected each offer. The other three partners initiated arbitration over "[a] dispute [that] has arisen as to the dissolution and winding up of the law partnership of Willacy, LoPresti & Marcovy, pursuant to the Partnership Agreement and ORC Ch. 1776, including the amount of distribution to the partners following the winding up." R. 3-1 at 2.

In response, Willacy filed a lawsuit against the old firm, his former partners, and their new firm in federal court. *See* R. 1. The court stayed the case pending arbitration. R. 20 at 10–11.

The arbitrator found that the old law firm had $69,274.41 in net assets, and she divided those assets among the four partners. R. 28-46 at 27. Willacy received $16,150 for his half draws, $20,800 for his original capital contribution, and $4,331.05 for his 33% share of the remaining assets. *Id.* In response, Willacy filed motions to lift the stay, to file a second amended complaint, and to vacate, modify, or correct the arbitration award. The district court confirmed the award, denied Willacy's motions, and entered judgment in favor of the defendants. Willacy appealed.

## II.

■ *Arbitrability.* Willacy first challenges the district court's arbitrability decision—its decision to honor the arbitration clause and to stay the lawsuit until the arbitration concluded. "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Arbitrators may determine the arbitrability of claims so long as they are *"arguably* covered by the agreement." *Turi v. Main Street Adoption Servs., LLP,* 633 F.3d 496, 511 (6th Cir. 2011). Whenever "the contract contains an arbitration clause," whether broad or narrow, "there is a presumption of arbitrability." *AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

"The gravamen of plaintiff's claims," as the district court correctly framed the issue, "is a dispute about what compensation plaintiff is entitled to for his interest in" the partnership. R. 20 at 11. The dispute about the half-draw payments no doubt began before the three partners announced the dissolution of the firm. We would be surprised if most issues related to the dissolution of a decades-old firm arose overnight. But all of these issues, no matter the first inkling of the problem, bear on "the method and de[ ]tails of liquidating the partnership business," R. 28-2 at 7, because the partners had a zero-sum pot of partnership assets to distribute. Willacy's purported right to the half-draw payments entitled him to a larger share of the partnership's assets and impacted his share in the firm's ownership. *See* R. 28-46 at 23–25. And his "other claims, including unfair dissolution of [the partnership] and failure to provide a fair buyout price and a statement of partnership assets," as the district court ruled, "arguably state claims related to the liquidation of" the partnership as well. R. 20 at 11.

Willacy offers two rejoinders. He (and the dissent) maintain that the district court abdicated its responsibility to assess whether his claims were arguably covered by the arbitration provision. The record shows otherwise. The district court, it is true, "le[ft] the final contract interpretation to the AAA arbitrator." *Id.* But it did so only after determining that all of Willacy's claims "related to the liquidation of" the firm and were arbitrable, *id.* an analysis that more than suffices to respect the arguable-coverage inquiry.

"[P]ayment of half-draws," we appreciate, "contemplates the continued existence of the partnership." Dissenting Op. 480. And resolution of the half-draw issue, we also appreciate, requires looking elsewhere in the contracts. *Id.* But the same goes for

determining ownership interests in a partnership. By the time Willacy filed his lawsuit over the half-draw and ownership issues, his former partners had dissolved the firm, and arbitration of "the method and de[ ]tails of liquidating the partnership business" was his only option. R. 28-2 at 7.

The dissent claims a distinction between broad and narrow arbitration clauses affects the presumption of arbitrability. We don't think so—at least not on this record. That "[s]uch a presumption is particularly applicable where the clause is a[ ] broad" one, *AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. 1415, does not mean that the presumption does not apply to a run-of-the-mill or a narrow arbitration clause.

*Bratt Enterprises, Inc. v. Noble International Ltd.* illustrates the point. 338 F.3d 609 (2003). The arbitration provision in *Bratt Enterprises* was narrow. And yet we invoked the presumption of arbitrability all the same—that "ambiguities as to the scope of the arbitration clause itself" should be "resolved in favor of arbitration." *Id.* at 613 (quotation omitted). Just so here. That we did not apply the presumption of arbitrability to one of the disputes flowed from a different consideration: The two disputes did not overlap. One of them concerned the valuation of the accounts receivable, and it was covered by the arbitration clause. The other dispute concerned whether the parties had agreed to cap liability for the accounts. *Id.* at 611–13. Because the second dispute did not affect the arbitrator's assessment of the accounts' value, no arbitration of it was required. Here, in marked contrast, the arbitrator could not determine the partners' ownership of the dissolved firm's assets without resolving the half-draw issue.

Willacy next argues, apparently for the first time on appeal, that the arbitration provision in the 1979 partnership agreement "was not personally signed by any-

one." Appellant's Br. 25. Even if he had preserved this argument, Willacy and the other partners signed the 2007, 2009, and 2010 amendments to the partnership agreement. *E.g.*, R. 1-3 at 1–2. Each amendment incorporated the 1979 partnership agreement, which included the arbitration provision. *E.g.*, *id.* at 1. No error occurred in staying the litigation pending the arbitrator's decision.

■ *Confirmation of the award and refusal to correct it.* Willacy intermixes his criticism of the district court's confirmation of the arbitration award with his arguments about the denial of his motions to correct, modify, or vacate the award. Because the arbitrator was "arguably construing or applying the contract" and because Willacy at most has shown potential errors in the merits of the award, both birds fall with one stone. *Mich. Family Res., Inc. v. Serv. Emps. Int'l Union Local 517M*, 475 F.3d 746, 753 (6th Cir. 2007) (en banc) (quotation omitted). "[J]udicial consideration of the merits of [an arbitrated] dispute is the rare exception, not the rule." *Id.* The arbitrator's twenty-five page ruling displayed her awareness of the partnership agreement, the partnership's history, and accounting principles. We "permit only the most egregious awards to be vacated." *Id.* This award readily clears that low bar. *See* R. 45 at 5–10.

Nothing indicates that the arbitrator's decision was based on anything but a good-faith effort to resolve the dispute, and the arbitration agreement amounts to a promise to look to an arbitrator, not to the courts, to resolve the merits of the parties' dispute. If "the request for judicial intervention should be resisted even though the arbitrator made 'serious,' 'improvident' or 'silly' errors in resolving the merits of the dispute," *Mich. Family Res.*, 475 F.3d at 753 (quotations omitted), it

follows that there is little room for a merits review of this award. ·

■ Willacy next argues that he is not responsible for half of the arbitrator's fees. In his view, the fees should have been split four ways, with equal parts paid by each partner. The arbitrator ruled that "[t]he administrative filing fees of the AAA totaling $1,275.00 and the compensation of the Arbitrator totaling $31,710.00 shall be borne equally by the parties. Therefore, [Willacy] is directed to pay [his former partners] the sum of $637.50 for his share of the AAA filing fees in this matter." R. 28-46 at 27. The arbitrator fairly split the costs and fees equally between the two sides of the arbitration, which is to say between Willacy (the plaintiff) on the one hand and the other three partners (the defendants) on the other. In using the word "parties," the arbitrator was referring to the two sides of the case, as shown by the reality that the "fees and costs" section begins by describing "[b]oth [p]arties." *Id.* at 25.

■ Nor was it "constitutional error," let alone constitutional error "beyond compare," for the arbitrator to refuse to hear testimony from a witness, the firm's office manager, whom Willacy failed to depose during the time allowed by the arbitrator. Appellant's Br. 39. Arbitrators generally "are not bound by formal rules of procedure and evidence, and the standard for judicial review of arbitration procedures is merely whether a party to arbitration has been denied a fundamentally fair hearing." *Nat'l Post Office, Mailhandlers v. U.S. Postal Serv.*, 751 F.2d 834, 841 (6th Cir. 1985). Between the preliminary hearing on February 2, 2015, and the deposition and discovery deadline of April 30, 2015, Willacy did not request a single deposition. R. 28-19 at 1. Even after the arbitrator exercised her discretion to allow Willacy a single post-deadline deposition, Willacy

failed to comply with the new deadline and deposition restrictions. R. 28-29 at 1. The arbitrator had ample grounds for refusing to hear this testimony, especially when other evidence addressed the same topic: the firm's finances.

■ *The post-award stay.* After confirming the arbitration award, the district court denied Willacy's motion to dissolve the stay because that motion had become moot. R. 45 at 10 n.4. This did not constitute an abuse of discretion. *See Bedford v. Bobby,* 645 F.3d 372, 375 (6th Cir. 2011). District courts "must grant" a motion to confirm a valid arbitration award "unless the award is vacated, modified, or corrected." 9 U.S.C. § 9. Willacy raised every issue in his amended complaint as a counterclaim during the arbitration proceedings. R. 28-20 at 4. He indeed submitted his amended complaint in its entirety to the arbitrator. *Id.* at 9–30. The arbitration award was a "full settlement of all claims and counterclaims submitted. All claims not expressly granted herein [we]re hereby denied." R. 28-46 at 27. There was no need to restart the litigation after the confirmed arbitration award resolved the entire dispute.

Willacy insists that the arbitrator had no *authority* to resolve the statutory or tort claims raised in his amended complaint. A more limited arbitration provision, it is true, might preclude arbitration of such claims. *See, e.g., Turi,* 633 F.3d at 510–11. But not this one. "Even real torts can be covered·by arbitration clauses [i]f the allegations underlying the claims 'touch matters' covered by the [agreement]." *Fazio v. Lehman Bros., Inc.,* 340 F.3d 386, 395 (6th Cir. 2003) (quotation omitted). And Willacy's statutory claims cannot "be maintained without reference to the contract or relationship at issue." *Nestle Waters N. Am., Inc. v. Bollman,* 505 F.3d 498, 505 (6th Cir. 2007).

Each of the statutory claims hinges on the partnership's liquidation and the amount of the firm's assets owed to Willacy. Count III hinges on whether the "notice of dissolution … was unlawful and ineffective because same was not premised upon the occurrence of any of the events specified in [Ohio Rev. Code] § 1776.61." R. 11 at 11. Count IV could not be decided without determining whether Willacy's dissociation from the firm did "not result in a dissolution and winding up of the partnership business," as Ohio Rev. Code § 1776.54(A) provides. *See* R. 11 at 12–13. Count V turned on whether Willacy was "contractually due" the half-draw payments that the arbitrator awarded him. *Id.* at 14. And Count VI turned on whether his former partners violated their fiduciary duties under Ohio Rev. Code § 1776.44(B)(1) by "transferring … the assets of [the old firm] to their newly formed partnership." *Id.* at 16. The district court could not resolve these claims, or any of the others, without relitigating the arbitrator's key decisions: whether Willacy's partners dissolved the partnership and, if so, what assets Willacy were due.

■ *The second amended complaint.* After confirming the arbitration award, the district court denied Willacy's motion for leave to file a second amended complaint, which included a revamped civil RICO claim. No abuse of discretion occurred. *See Perkins v. Am. Elec. Power Fuel Supply, Inc.,* 246 F.3d 593, 604–05 (6th Cir. 2001). A little background is in order. In Willacy's first amended complaint, he added a civil RICO claim based on his partners' supposed bank fraud. The district court granted Willacy's motion to dismiss this claim without prejudice after the other partners pointed out that Willacy, who is not a financial institution, lacked standing to bring a civil RICO claim premised on bank fraud when his personal injury was

not the same as the injury to the financial institutions. *See* R. 12 at 5–7; *see also Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 564–66 (6th Cir. 2013) (en banc).

The second amended complaint did not materially improve on the first one or offer a good explanation for the delay. It alleged that the former partners had used the partnership's bank account to pay automobile leases, in an inappropriate attempt to obtain " 'draws' in amounts greater than those to which they were contractually entitled," and that they had misstated the ownership interests in the firm when applying for a line of credit. R. 25-1 at 16–17. That is not much of an improvement on the first RICO claim, which alleged that the partners had attempted "to unjustly enrich themselves" by "causing checks … to be issued to themselves … for so-called partnership 'draws' in amounts greater than those to which they were contractually entitled" and by misstating the ownership interests in the firm when applying for a line of credit, R. 11 at 14–15. Willacy surely knew about the evidence of wire fraud—the "long-distance, interstate, telephone conversation" on December 10, 2013, between Willacy and his partners— *before* filing his original and first amended complaints in 2014. R. 25-1 at 17. Willacy after all was on the call and mentioned it in his prior complaints. R. 1 at 8; R. 11 at 8. Any other new evidence would not help Willacy overcome the difficulties that led to his request for dismissal of the first amended complaint's civil RICO claim. The district court acted within its discretion in deciding that a new amended complaint "[a]t th[at] point in the litigation—seventeen months after the case was initiated, after the plaintiff had a full and fair opportunity for his claims to be heard in arbitration, and after [the district court] ha[d] confirmed the arbitration award— … would be extremely prejudicial to defendants." R. 45 at 10 n.4; *see Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458–59 (6th Cir. 2001).

"[T]here is nothing in the text of the RICO statute," contrary to Willacy's argument, "that even arguably evinces congressional intent to exclude civil RICO claims from the dictates of the Arbitration Act" if the arbitration agreement covers the claim. *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 238, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). His claim instead looks like an effort to evade the consequences of the arbitrator's decision "by renaming [his] claims so that they appear facially outside the scope of the arbitration agreement." *Simon v. Pfizer Inc.*, 398 F.3d 765, 776 (6th Cir. 2005). Because the civil RICO claim requires the court to determine Willacy's rights to the dissolved partnership's assets, the civil RICO claim could not "be resolved in [Willacy's] favor even [though] he los[t] the arbitration." *Id.* at 777. Consider the overlapping relief sought in each claim. The second amended complaint requested "an amount not less than $520,000" for his civil RICO claim, R. 25-1 at 18, an amount quite similar to the "$525,110 return of capital obligation" requested in the first amended complaint, R. 11 at 10, and the "capital account … amount of $512,000.00" he requested from the arbitrator, R. 28-46 at 12. The district court fairly rejected the motion.

*The proposed pronouncement.* The district court declined Willacy's invitation to issue a Civil Rule 54(b) certification or "a pronouncement that all of [Willacy's] claims against defendant LoPresti, Marcovy, and Marotta, LLP, and those of plaintiff's claims against the individual defendants … which sound in tort remain pending and undetermined in this case." R. 47 at 1; R. 53 at 9. The court based its ruling on res judicata principles, but the

dispute was more fundamentally about what the arbitrator did in her confirmed award. The arbitration award was in fact a "full settlement of all claims and counterclaims submitted." R. 28-46 at 27.

Under the Federal Arbitration Act, we look to federal law to determine whether the arbitrator had authority to decide Willacy's claims, even the claims based on Ohio law. *Southland Corp. v. Keating,* 465 U.S. 1, 16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). Because Willacy and his former partners consented to arbitration of claims arguably related to the liquidation of the partnership, the arbitrator had the power to decide Willacy's claims. This includes both the statutory and tort claims. *See Shearson/Am. Express,* 482 U.S. at 238, 107 S.Ct. 2332; *Fazio,* 340 F.3d at 395. Willacy might have made more headway if he had filed his counterclaims correctly, as the arbitrator instructed him. *See* R. 28-24. But he is not correct in asserting that he "had *no opportunity whatsoever* to litigate his RICO and state tort law claims in the arbitral forum." Appellant's Br. 46.

As Willacy acknowledges, the Rule 54(b) certification became moot when the district court entered final judgment as to all parties still in the litigation. *Id.* at 42; *see Gen. Acquisition, Inc. v. GenCorp, Inc.,* 23 F.3d 1022, 1026–27 (6th Cir. 1994). Because res judicata "bars further claims by parties or their privies based on the same cause of action," the confirmation of the arbitration award resolving all claims against LoPresti, Marcovy, and Marotta necessarily barred Willacy's claims against the new law firm, LoPresti, Marcovy & Marotta, LLP, as well. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). No error occurred.

*Costs and interest.* The district court also refused to grant Willacy the costs of his lawsuit under Civil Rule 54(d)(1) and declined to give him interest on the amount of his award in the arbitrator's ruling. R. 53 at 4–6, 9. The district court was correct in part and incorrect in one small part.

■ The court correctly ruled that Willacy was not entitled to his costs as "the prevailing party." Fed. R. Civ. P. 54(d)(1). "[A] plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby,* 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); *see Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.,* 532 U.S. 598, 604, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). Yet Willacy's partners were the ones who requested arbitration and confirmation of the arbitrator's award, and that's what happened. They prevailed, not Willacy. *See Riviera Distribs., Inc. v. Jones,* 517 F.3d 926, 928–29 (7th Cir. 2008); R. 53 at 6 n.4. Arbitration agreements like this one "are designed to reduce the price tag of decision-making. By filing ... suit, [Willacy] forced [his partners] to bear the very expenses that the parties had agreed to avoid. The party responsible for creating excessive legal costs must bear them itself in the end." *Riviera,* 517 F.3d at 929.

That the arbitrator awarded Willacy $41,281.05 does not make him the prevailing party either. That amount was a small percentage of the half-million dollars he requested. *Id.* And Willacy opposed confirmation of the award, and lost. *See* R. 24; R. 25; R. 27; R. 41; R. 42; R. 47; R. 49; R. 50; R. 52; R. 54. He cannot now claim prevailing party status.

■ All of this does not mean, however, that the district court correctly denied him prejudgment interest on the $41,281.05 award. "[S]tate law governs awards of prejudgment interest." *F.D.I.C. v. First*

*Heights Bank, FSB*, 229 F.3d 528, 542 (6th Cir. 2000). Under Ohio law, "when money becomes due and payable … upon *any* settlement between parties, upon *all* verbal contracts entered into, and upon *all* judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest." Ohio Rev. Code § 1343.03(A) (emphases added). The district court's judgment, by confirming the arbitrator's award, "include[d] the $41,281.50 to [Willacy]." R. 53 at 6. Willacy therefore had "a right under [Ohio Rev. Code § ] 1343.03(A) to an interest award as a matter of law, and the trial judge ha[d] no discretion not to grant any interest award." *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 692–93 (6th Cir. 2000); *see also Broad Street Energy Co. v. Endeavor Ohio, LLC*, 806 F.3d 402, 409 (6th Cir. 2015). Though the rest of the arbitration award favored Willacy's partners, they had the "use of money which rightfully belonged to" Willacy before the district court entered its judgment. *Musisca v. Massillon Cmty. Hosp.*, 69 Ohio St.3d 673, 635 N.E.2d 358, 360 (1994).

Willacy, it is true, did not request pre-award interest from the arbitrator or raise the issue in a timely motion to modify the arbitrator's award. *See* 9 U.S.C. § 12. But Ohio law required Willacy's partners to pay prejudgment interest once *the district court* entered its judgment even though this "was not a matter presented to the arbitrators." *Hellmuth, Obata & Kassabaum v. Ratner*, 21 Ohio App.3d 104, 487 N.E.2d 329, 331 (1984). Willacy's motion to correct the judgment also was timely, even if we treat it as a motion to alter or amend the judgment. *See* Fed. R. Civ. P. 59(e), 60; *Pogor v. Makita U.S.A., Inc.*, 135 F.3d 384, 388 (6th Cir. 1998).

Willacy also requested "post-judgment interest," an issue controlled by federal law. *Broad Street Energy Co.*, 806 F.3d at 410; *see* 28 U.S.C. § 1961. But the district court did not consider the issue. On remand, then, the court should determine how much prejudgment interest Willacy deserves and decide whether post-judgment interest is proper as well. *Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 741 (6th Cir. 2016).

For these reasons, we reverse the district court's refusal to grant Willacy prejudgment interest, remand for the calculation of prejudgment interest and for a determination of whether Willacy deserves post-judgment interest, and affirm the rest of the district court's decisions.

HELENE N. WHITE, Circuit Judge, concurring.

I concur because the half-draw dispute was arguably arbitrable under the partnership agreement's arbitration clause.

The clause required "arbitration in accordance with the rules of the American Arbitration Association.…" P'ship Agreement, R. 1-1, PID 22. The AAA's rules vest the arbitrator with "the power to rule on his or her own jurisdiction, including … the arbitrability of any claim or counterclaim." AAA Commercial Rule 7 (2013); *see also Bishop v. Gosiger, Inc.*, 692 F.Supp.2d 762, 769 (E.D. Mich. 2010) (collecting cases holding that contracts requiring arbitration under AAA rules vest arbitrators with the authority to decide arbitrability). However, as the dissent emphasizes, "even where the parties expressly delegate to the arbitrator the authority to decide the arbitrability of the claims related to the parties' arbitration agreement, this delegation applies *only* to claims that are at least *arguably* covered by the agreement." *Turi v. Main Street Adoption Servs., LLP*, 633 F.3d 496, 511 (6th Cir. 2011) (first empha-

sis added and second in original). The more narrow an arbitration clause, the less likely it is that a claim is "arguably" covered by it. *See id.* at 507.

There is no doubt that this arbitration clause is a narrow one. Between 1979 and 2014, no dispute between the partners, including the half-draw dispute, would have been "arguably" arbitrable under the clause because the "partnership business" was ongoing. The clause was inoperable until the firm dissolved, the "partnership business" reached its end, and only liquidation remained. At that point, the arbitration clause arguably took on a fairly broad scope. The arbitration clause uses the phrase "method and de[ ]tails of liquidating the partnership business" without further elaboration. P'ship Agreement, R. 1-1, PID 22. One may fairly read the phrase as not covering the half-draw dispute because that dispute did not arise from the liquidation. Or, the dispute may fairly be viewed as well within the scope of the arbitration clause as a detail of the liquidation because all that remained were partnership assets and the partners' claims. The arbitration provision is sufficiently ambiguous that the half-draw dispute was at least *arguably* a "de[ ]tail[ ] of liquidating" what remained of the partnership business. *See id.* The district court's order referred the arbitrability question to the arbitrator, and the arbitrator resolved the half-draw dispute, implying that she considered it covered by the arbitration clause.

KAREN NELSON MOORE, Circuit Judge, dissenting.

I disagree with the majority that the half-draw claim raised by Willacy was subject to arbitration. Although federal policy favors broad construction of a general arbitration clause, when the parties limit the scope of arbitration to a narrow set of issues, we are required to enforce the contract as written and exclude claims not contemplated by the agreement. Because I believe that Willacy's half-draw claim is separate from the "method and de[ ]tails of liquidating the partnership business," I respectfully dissent.

In his motion to modify and correct the arbitral award or, in the alternative, vacate the award, Willacy argued that the arbitrator made material miscalculations, including by miscalculating the withheld half-draw payments. R. 27 (Mot. to Modify & Correct/Vacate at 13–15) (Page ID #364–66); Appellant's Br. at 18. On appeal, Willacy argues that the district court erred in denying this motion because the award "ignored unambiguous and clearly applicable specific terms of the parties' partnership agreement." Appellant's Br. at 34–36.

When we apply the correct standard, it is clear that the issues addressed by the arbitrator exceeded the scope of the narrow arbitration clause. We review de novo a district court's arbitrability decision. *Simon v. Pfizer Inc.*, 398 F.3d 765, 772 (6th Cir. 2005). Although it is generally true that "[d]oubts should be resolved in favor of coverage," *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), "the FAA's presumption of arbitrability regarding the merits of a dispute does not apply with equal force to narrow arbitration agreements," *Turi v. Main St. Adoption Servs., LLP*, 633 F.3d 496, 507 (6th Cir. 2011); *see also Simon*, 398 F.3d at 775 ("[a] longstanding principle of this Circuit is that no matter how strong the federal policy favors arbitration, 'arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration'") (citation omitted). "The more narrow the arbitration clause in question,

the more likely that the provision does not even 'arguably' apply to the dispute at issue." *Turi*, 633 F.3d at 507.

We have distinguished between broad arbitration clauses that submit to arbitration "[a]ny controversy arising out of or relating to" an agreement, *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003), and narrow arbitration clauses that limit the scope of arbitration to a fixed set of issues. *Simon*, 398 F.3d at 775. In interpreting the former, the presumption favoring arbitration applies. *Id.* We have therefore recognized that when construing a general arbitration clause, "[a] proper method of analysis ... is to ask if an action could be maintained without reference to the contract or relationship at issue." *Fazio*, 340 F.3d at 395.

In contrast, when interpreting a narrow arbitration clause, the fact that two claims have the same factual underpinnings is not dispositive. *Simon*, 398 F.3d at 776. We have therefore held narrow arbitration clauses inapplicable to claims that rely on different legal standards or require proof of additional elements even when the claims rely on the same set of facts. *See, e.g., Turi*, 633 F.3d at 511 (holding that plaintiffs' state tort and RICO claims were not covered by an arbitration clause covering disputes "regarding fees"); *Simon*, 398 F.3d at 777 (holding that plaintiff's claims were not covered where the claims "require consideration of some factual issues that are subject to arbitration, but ... have independent legal bases," including establishing "termination for gross misconduct" as opposed to "termination for Just Cause"). More importantly, under this strict approach, we may determine that a claim is beyond the scope of a narrow arbitration clause even when resolution of the claim requires reference to the arbitrable dispute. *Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003).

Our holding in *Bratt* is particularly instructive. There we considered whether a claim regarding the liability limit in a business purchase agreement was covered by a narrow clause that subjected to arbitration "disagree[ments] with any of the amounts included in the Closing Balance Sheet." *Id.* at 612. Plaintiff disputed its obligation to pay any amount exceeding the liability limit, and argued that this claim was related to a balance sheet dispute. We disagreed, and held that although the liability limit would have controlled the amount of recovery under the balance sheet, the dispute did "not itself involve a 'disagree[ment] with any of the amounts included in the Closing Balance Sheet,'" and therefore was beyond the scope of the arbitration clause. *Id.* at 613. Contrary to the lead opinion's assertion, our conclusion in *Bratt* did not depend upon two disputes that did not overlap. In holding that the arbitration clause did not cover the liability limit, we held that a strict and narrow reading was required even where the claim regarding the limit "would obviously require reference to the closing balance sheet to determine matters of valuation." *Id.* Even where two claims relate, "[t]he federal policy that favors arbitration is not so broad that it compels the arbitration of issues beyond those agreed to by the parties." *Id.*

Here, the partnership did not contain a general arbitration clause. The parties committed to arbitration only disputes about the "method and de[ ]tails of liquidating the partnership business." R. 28–2 (Law Partnership Agreement at 7) (Page ID #386). The half-draw claim is clearly outside the scope of this clause. The claim relates to a separate contractual arrangement regarding compensation of retiring partners, and relies on completely different legal standards that are in no way "substantially identical" to the question of how to liquidate a partnership. *Simon*, 398

F.3d at 776. Indeed, payment of half-draws contemplates the continued existence of the partnership, and is therefore clearly distinct from dissolution. As was the case in *Bratt*, resolution of the half-draw claim, though significant to liquidation, did not *itself* involve a determination of the method and details of liquidation. *See Bratt*, 338 F.3d at 613 (noting that the key inquiry underlying the liability limit related to mutual mistake, not the amount in the closing balance sheet). Moreover, the arbitration clause was contained in the specific section of the Partnership Agreement dealing with termination of the partnership. R. 28–2 (Law Partnership Agreement at 7) (Page ID #386). Separate sections dealing with the withdrawal of a partner, *id.* at 5–6 (Page ID #384–85), and subsequent amendments that provide for payment of half-draws, R. 1–4 (2010 Amendment at 1–2) (Page ID #34–35), make no mention of arbitration. *See Simon*, 398 F.3d at 775–76 (noting that the scope of arbitration provisions is confined to the scope of the two sections that provide for arbitration).

Finally, the half-draw claim at issue here arose before dissolution. Appellant's Br. at 27. The lead opinion argues that the time at which the claim arose is of no relevance, because "the partners had a zero-sum pot of partnership assets to distribute." Under the strict analysis in *Bratt*, however, that determination is insufficient to end the inquiry. A dispute is not covered by an arbitration clause merely because its resolution bears directly on the arbitrable issue. *Simon*, 398 F.3d at 777. Nor can we construe that clause broadly in order to "avoid piecemeal litigation." *Id.* Whether the half-draw claim affects the amount subject to liquidation is a separate matter. In construing a narrow arbitration clause, we must instead ask whether resolution of the claim at issue involves the object of the clause itself. Where, as here, resolution of the claim does not *by itself* involve consideration of the issues that were submitted to arbitration, the clause is not ambiguous, and cannot be interpreted to cover that claim. Because the half-draw claim is not a dispute about the "method and de[ ]tails of liquidating the partnership business," resolution of that claim should not have been submitted to arbitration.

When parties agree to arbitrate only a limited set of issues, federal courts may not submit to arbitration disputes outside the scope of a narrow arbitration clause. Here, the arbitrator incorrectly resolved Willacy's half-draw claim, which was not a dispute about the "method and de[ ]tails of liquidating the partnership business." R. 28–2 (Law Partnership Agreement at 7) (Page ID #386). Because I disagree that the half-draw claim was arbitrable, I respectfully dissent.